IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF WISCONSIN

RANDAL S. BERZ,

                            Plaintiff,                       OPINION AND ORDER

    v.
                                                    19-cv-225-wmc

ANDREW M. SAUL, Commissioner,
Social Security Administration,

                          Defendant.

On August 17, 2015, plaintiff Randal Berz protectively filed an application for disability and disability insurance benefits, alleging disability beginning on August 11, 2015. On June 14, 2018, Administrative Law Judge ("ALJ") Diane S. Davis issued a partially favorable decision, finding that Berz was disabled beginning on March 25, 2018, nearly three years after the alleged onset date. Plaintiff appealed that decision under 42 U.S.C. § 405(g). Following full briefing, the court held oral argument on March 26, 2020, in which counsel for both parties participated. For the reasons discussed below, the court will now reverse the decision of the Commissioner of Social Security and remand for further proceedings.

BACKGROUND

Berz holds a college degree and previously worked as a security director for a correctional facility from 1977-2011, and then as a custodian from 2012-2015. (AR at 198.) He stopped working on August 11, 2015, at which point he claimed permanent disability. (AR at 197.) Berz was 61 years old at the time. (AR at 21.)

A. **Medical Record**

Berz alleges that he became disabled in 2015 due to a variety of medical conditions, including acromegaly,[1] pituitary disorder, osteoarthritis, heart disease, a history of multiple joint replacements, two separate back fusions, and a brain tumor.  (AR at 197.)  Prior to his alleged onset date, Berz had a pituitary brain tumor, for which he underwent surgery and Gamma Knife Radiation in 2000.  (AR at 471.)  After the interventions, diagnostic testing showed "no residual disease" and normal lab work (AR at 408), and an MRI showed "[n]o evidence of recurrent tumor" (AR at 359).  Nevertheless, the record shows that Berz experienced a number of ongoing issues stemming from the historic overproduction of growth hormone caused by the tumor, even though the tumor itself was successfully removed.  (AR at 471.)  In particular, the record shows that this historic hormonal imbalance contributed to various cardiac issues, sleep apnea, spinal problems, multiple joint abnormalities, and acromegaly.  (AR at 471.)  Also before Berz's alleged onset date, he experienced a myocardial infarction in March of 2014, after which he went on beta-blockers (metoprolol) and decreased his testosterone prescription.  (AR at 408, 419.)

Because plaintiff argues primarily that the ALJ failed to fully account for evidence of Berz's fatigue and lack of stamina in the medical record, the court will likewise focus on those records.  Records indicate that Berz reported fatigue at least one year prior to his alleged onset date.  On August 15, 2014, Berz had an appointment with his endocrinologist

---

[1] "Acromegaly is a hormonal disorder that develops when your pituitary gland produces too much growth hormone during adulthood."  Mayo Clinic, "Acromegaly" (Jan. 18, 2019),  https://www.mayoclinic.org/diseases-conditions/acromegaly/symptoms-causes/syc-20351222.

Jane Korducki, M.D., to evaluate his panhypopituitarism.  (AR at 417.)  Dr. Korducki noted Berz's recent heart attack, but was "doing really quite well and is back to work." (AR at 417.)  Berz did, however, report low back pain, joint pain, and that he "does feel more tired than usual."  (AR at 417.)  Dr. Korducki wrote that she "did not feel the fatigue was related to testosterone deficiency.  His current levels are excellent on his current dose of testosterone.  Did suggest that the metoprolol may be playing a role."  (AR at 418.)  The following day, Berz was seen by Mario Skobic, M.D., for a comprehensive medical and yearly physical.  (AR at 414.)  A variety of conditions were listed under Berz's past medical history, including chronic fatigue.  (AR at 414-15.)

On February 2, 2015, Berz again had an appointment with Dr. Korducki, at which she adjusted Berz's medication levels.  (AR at 408.)  She also noted that Berz mentioned that "he perhaps does not have as much energy as he did before, but . . . he relates some of this to aging.  Additionally, he did have the heart attack, which might be contributing." (AR at 408.)

On August 7, 2015, Berz met with his internist, Thomas Cunningham, D.O., for a preoperative medical evaluation before a total knee arthroplasty.  (AR at 400.)  Dr. Cunningham noted Berz's reports of knee and low back discomfort, although observed that he remained physically active by virtue of his job as a custodian.  (AR at 400.)  Berz also reported "symptoms of decreased stamina as well as issues regarding hypersomnia reported by his wife today.  There are days he will sleep up to 12 hours, particularly on weekends." (AR at 400.)  Dr. Cunningham did not believe that his sleep apnea was the cause of his

hypersomnia as Berz was compliant with his BiPAP, but he did note "concerns about underlying depression and associated decrease in motivation." (AR at 402.)

On August 11, 2015, Berz underwent a left total knee arthroplasty due to a history of persistent knee pain and osteoarthritis. (AR at 330.) He remained in the hospital until August 13, 2015, at which point he was discharged after doing well in physical and occupational therapy. (AR at 335.) Nonetheless, orthopedic surgeon John E. Morrissey, M.D., wrote in his discharge summary that Berz "has significant back issues, . . . has undergone a total hip replacement, bilateral total knee replacements, has acromegaly, and significant endocrine problems. For all these reasons, I do not feel he will be able to return to work, and so I do believe he is permanently disabled." (AR at 332.)

After the surgery, Berz began meeting with physical therapist Katherine Steingraeber. One week after the surgery, Berz reported knee pain and decreased strength and range of motion, but with a "good to excellent" prognosis. (AR at 375.) The record also indicates that he reported "[o]verall reduced energy level in the last 10 months." (AR at 374.) After seventeen sessions, on October 16, 2015, Berz was discharged from physical therapy services due to his progress and the fact that he was "essentially close enough to meeting all of his goals and functionally is significantly improved from where he was prior to surgery." (AR at 432-33.)

On August 31, 2015, Dr. Cunningham met with Berz to observe his progress following the knee surgery. (AR at 419.) Dr. Cunningham reported that there was "excellent healing" of the surgery site and that Berz was decreasing his pain medications, but that Berz "continues to struggle with daytime fatigue." (AR at 419.) On the PhQ-9

4

evaluation,[2] he "scored 3 points for fatigue and lack of energy, 2 points for trouble falling asleep or staying asleep or sleeping too much, the latter being the issue, and 1 point for disinterest, feeling down, depressed or hopeless, and difficulty with concentrating."  (AR at 419.)

On September 28, 2015, Berz again met with Dr. Cunningham to discuss "his ongoing decrease in stamina."  (AR at 449.)  Berz reported to Dr. Cunningham that "he is able to only to work approximately 1 hour before becoming quite fatigued and unable to proceed" and that the loss of stamina had "been gradually occurring since his myocardial infarction in March of 2014 with progressively decreasing energy level and stamina in the fall and winter months of last year."  (AR at 449.)  Dr. Cunningham wrote that he could not "specifically put a finger on the exact etiology of" Berz's "[d]ebilitating fatigue and decreased stamina."  (AR at 450.)  About a week later, Dr. Cunningham again noted that Berz had "been having significant debilitating loss in stamina."  (AR at 454.)  Although Berz "noted perhaps a slight improvement in his stamina after being placed on sertraline and tirated up to 50 mg daily. . . . he is not anywhere near his baseline self pre-infarction." (AR at 454.)

On October 2, 2015, Berz was seen by Nestor Machare-Delgado, M.D., with a chief complaint of "persistent daytime fatigue.  No snoring.  Has stable sleep apnea.  Good BPAP compliance."  (AR at 456.)  During the appointment, Berz reported that he was "only able

---

[2] The PHQ-9 is a self-administered diagnostic instrument for measuring depression.  Kurt Kroenke, et al., The PhQ-9, J. Gen. Intern. Med. (Sept. 16, 2001).  It scores each of the nine DSM-IV criteria on a range from "0" (not at all) to "3" (nearly every day).  *Id.*  The numbers given for each of the criteria are then added together and used to assess the severity of the patient's depression.  *Id.*

to work approximately 1 hour before becoming quite fatigued and unable to proceed.  This was occurring 3 months prior to his left total knee arthroplasty performed on August 2015."  (AR at 456.)  Dr. Machare-Delgado wrote that Berz "had tried treatment with SSRI therapy with sertraline up to 50 mg daily for his decrease in energy since, however he has not noted any effect of this."  (AR at 456.)  Machare-Delgado then changed Berz's BPAP mask, and noted that if his blood work was normal, Berz "may benefit from trial of Provigil/bupropion as CNS stimulant."  (AR at 457.)

That same day, Berz also met with Dr. Korducki, his endocrinologist.  (AR at 464.) She wrote that Berz reported "extreme fatigue" and "poor stamina."  (AR at 464.)  She continued:

> If he does work at all, he sits in a chair and just cannot do anything.  He can sleep 10 to 12 hours per night and still fall asleep. . . .  He is on a medical leave now following a knee replacement.  He is scheduled to go back soon, but he just does not feel like he can even consider it.  He reports falling asleep on the job prior to his knee surgery.

(AR at 464.)  In her impression, Dr. Korducki wrote that she thought Berz's fatigue was "multifactorial," and that depression, his metoprolol medication, "low-ish" testosterone medication, and anemia following the surgery could all be contributing factors.  (AR at 460.)

In early December of 2015, a number of Berz's treating physicians wrote letters in response to requests from the Wisconsin Department of Health Services regarding Berz's social security disability application.  Dr. Cunningham wrote that Berz had "ongoing issues regarding substantial loss of stamina and overall fatigue."  (AR at 470.)  According to Dr. Cunningham, these symptoms "are of a degree that significantly impact his ability to carry

6

on employment" but that he would reassess Berz's possible return to the workplace in future visits. (AR at 470.) Similarly, Dr. Korducki wrote that "[d]espite adjustments in his hormonal medications he continues to experience fatigue and decreased stamina. He may not be able to do his current job because of this." (AR at 469.) And neurosurgeon Mark K. Stevens, M.D., Ph.D., wrote that he believed Berz "certainly is a good candidate for social security disability," although did not mention any reports of fatigue or decreased stamina from Berz. (AR at 471-72.) Dr. Stevens also completed a questionnaire in which he opined, among other things, that Berz would require hourly unscheduled breaks for 10 to 15 minutes each and would be absent from work more than 2 days per months. (AR at 475-76.)

In mid-December of 2015, Berz had yet another appointment with Dr. Cunningham to discuss his fatigue issues. (AR at 491.) Berz suggested that he had perhaps seen some improvement with the antidepressant therapy, specifically with sertraline, and with the increase in his testosterone dose, and they further discussed whether Berz's beta-blocker therapy (metoprolol) affected his stamina. (AR at 491.) Despite the possible improvement, Berz informed Dr. Cunningham that he is still only able to perform activity for "[a]bout 30 minutes to at most 1 hour before he needs to stop and rest because of fatigue." (AR at 491.)

Later that month, Berz met with his cardiologist Shahyar Gharacholou, M.D., during which he reported being "really bothered by a lot of fatigue" and feeling "in retrospect that his symptoms perhaps got a little bit worse when his metoprolol was increased." (AR at 486.) In response to these complaints, Dr. Gharacholou asked Berz to

"trial a half dose" of the metoprolol.  (AR at 487.)  In follow-up appointments in January, February, March, and April of 2016 with Drs. Cunningham and Korducki, Berz continued to experience poor stamina, (AR at 482, 484, 622, 624), and "[a]fter initially feeling perhaps some slight improvement in his stamina [after his dose of metoprolol was reduced], subsequent analysis and subjective sense revealed no major improvement" (AR at 622).

Dr. Cunningham again wrote a letter in March of 2016, reporting that Berz "continues to have severe diminishment in overall physical stamina and energy, significantly impacting his ability to continue his work as a custodial engineer. . . . Accordingly, I have expressed to [Berz] that it is my opinion that he does not appear capable of returning back to his workplace as a custodian."  (AR at 556.)

On April 11, 2016, William Fowler, M.D., interviewed and examined Berz and also reviewed Berz's medical records for the purpose of an independent medical examination. (AR at 558-59.)  Dr. Fowler notes that "by late 2014 to early 2015, [Berz] was having increased difficulty with poor stamina or endurance for previously routine daily activities." (AR at 560.)  Berz told Dr. Fowler that

> his main most bothersome and most limiting discomforts have to do with his persistent fatigue and low energy or poor stamina. . . . Regarding his fatigue, he reports despite combination of medications used including Sertraline, and assurances his BIPAP was adequately adjusted for his chronic obstructive sleep apnea, he still has found he needs to sleep about 10 hours each night now as opposed to his estimating he sleeps about seven hours per night prior to March 2014.  He notes that he typically now can only work about 30 minutes at a time before he has to sit down or otherwise rest.  He likewise reports he usually gets up as late as 8:00 a.m. and usually by about 1:00 [p.m.] or so in the afternoon he has to take a nap, typically one to three hours in duration.  He then feels a little

8

bit better for the next couple of hours, though by early evening
on into bedtime he feels increasingly more fatigued.

(AR at 561.)  Dr. Fowler went on to observe:  "Overall, his fatigue remains the key
functionally impairing symptom or diagnosis which unfortunately cannot be well measured
for him or any other such patient. . . .  [W]e remain highly dependent on the claimant's
own report.  However, his report of recent reduced activity tolerance including the need
for frequent daytime naps and excessive breaks seems consistent with what he and his
treating physicians have described."  (AR at 566.)  Dr. Fowler ultimately concluded that
Berz "seems currently unable to perform work unless he is provided extraordinary freedom
to nap or otherwise take a break lasting at least 15 minutes at a time, at least once every
30 minutes during his work shift."  (AR at 566-67.)

In May of 2016, Berz once again saw Dr. Machare-Delgado, with the similar chief
complaint of "persistent daytime fatigue."  (AR at 617.)  The treatment notes indicate that
"he denies any afternoon naps now, he feels tired in the morning with poor daytime
performance," and that he "walks a mile daily without getting dyspneic."  (AR at 617.)
Berz further reported being "able only to work approximately 1 hour before becoming quite
fatigued and unable to proceed."  (AR at 617.)  Later that month Berz underwent a mental
status evaluation by psychologist Kurt A. Weber, PhD.  (AR at 571.)  Dr. Weber wrote
that Berz's chief complaint was "fatigue and low energy," and that Berz reported "his sleep
of late has been excessive."  (AR at 571, 573.)  Dr. Weber ultimately diagnosed Berz with
unspecified depressive disorder, but concluded that his "prognosis seems to be a generally
good one."  (AR at 575.)

Berz continued to meet periodically with his internist, Dr. Cunningham, consistently complaining of fatigue. In August of 2016, Dr. Cunningham wrote that Berz "continues to have episodes of significant decrease in stamina particularly intermittently, with occasional episodes of more vigor. . . . Sleep has been disrupted recently due to the presence of 2 new golden retrievers in his household, requiring that he get up at night periodically. Nonetheless, he has had ongoing issues with significant decrease in stamina that is felt to be on the basis of his acromegaly and pituitary macroadenoma." (AR at 619.) In August of 2017, Dr. Cunningham wrote: "[Berz] continues to experience decrease in stamina, particularly later in the morning and later afternoon. He has been able to walk his dog on a generally regular basis." (AR at 593.) In September of 2017, Dr. Cunningham wrote that Berz "will have an occasional 'good day' every 3 to 4 weeks but otherwise loses overall stamina later in the morning resulting in a nap several hours' duration usually in the early afternoon into the mid afternoon." (AR at 596.)

In June of 2017, Dr. Cunningham completed a "physician's statement" for an insurance company regarding Berz's ability to work. In the statement, Dr. Cunningham wrote that the "physical demand" of Berz's previous job as a custodian exceeded Berz's ability to perform the job, and that Berz's limitations were "based on poor stamina." (AR at 586.) Dr. Cunningham also completed another form in which he found that Berz could only sit, stand, walk, or drive for one hour, respectively, within a standard work day, and that these abilities were "severely" limited by Berz's stamina. (AR at 583.) Treatment notes from Dr. Cunningham in August of 2017 indicate that Berz "continues to experience

decrease in stamina, particularly later in the morning and in the later afternoon." (AR at 593.)

Then on March 22, 2018, Berz was admitted to the intensive care unit for an emergency cerebral angiogram due to a suspected aneurysm. (AR at 659, 691-93.) On March 25, 2018, the medical records indicate that Berz experienced a variety of neurological complications after the procedure, which the court need not review as it is undisputed that Berz became disabled on this date. (*See* AR at 30.)

### B. ALJ Decision

Berz filed a protective application for a period of disability and disability insurance benefits on August 17, 2015. (AR at 14.) After his claim was denied initially and on reconsideration, he requested a hearing before an ALJ. (AR at 14.) On May 9, 2018, ALJ Diane Davis conducted a hearing, at which Berz, his counsel, and vocational expert Ronald Malik appeared. (AR at 14.) ALJ Davis issued an eighteen-page decision, concluding that Berz was not disabled as of his alleged onset date, but finding disability beginning on March 25, 2018. (AR at 32.)

ALJ Davis considered Berz's claim under the five-step sequential framework set forth in the regulations. (AR at 16-32.) At step one, the ALJ found that Berz had not engaged in substantial gainful activity since August 11, 2015. (AR at 17.) At step two, the ALJ found that Berz suffered from a variety of severe medical conditions, but at step three found that none of those conditions met or equaled the severity of a listing. (AR at 17-20.)

At step four, the ALJ made two findings regarding Berz's residual functional capacity ("RFC").  First, she concluded that before March 25, 2018, Berz had the RFC to perform sedentary work, "except the claimant can only frequently climb ramps, stairs, ladders, ropes and scaffolds; and frequently balance and stoop.  The claimant can only occasionally kneel, crouch, and crawl."  (AR at 20.)  In formulating this RFC, the ALJ discussed Berz's medical records regarding his complaints of fatigue, and she also considered, but mostly discounted, the medical opinion evidence from Berz's various treating physicians as being conclusory, inconsistent, or not supported by objective findings.  (AR at 22-28.)  Second, the ALJ found that beginning on March 25, 2018, Berz had the additional limitation of being consistently off task for at least 15% in an eight-hour workday due to his "significant neurological event" in March of 2018 and its consequent limitations.  (AR at 30.)

Finally, at step five, the ALJ concluded based on testimony from vocational expert Malik that before March 25, 2018, Berz was "capable of performing past relevant work as a supervisor, correctional facility (DOT 099.117-014) as generally performed in the national economy."  (AR at 31.)  However, beginning on March 25, 2018, ALJ Davis concluded that Berz was no longer capable of performing past work, and also that no other jobs existed in significant numbers in the national economy that he could perform.  (AR at 31-32.)  Based on these findings, therefore, the ALJ held that Berz was not disabled under the regulations before March 25, 2018, but that he became permanently disabled on that date.  (AR at 32.)

OPINION

The standard by which a federal court reviews a final decision by the Commissioner of Social Security is well settled.  Findings of fact are "conclusive," so long as they are supported by "substantial evidence." 42 U.S.C. § 405(g).  Substantial evidence means "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971).  When reviewing the Commissioner's findings under § 405(g), the court cannot reconsider facts, re-weigh the evidence, decide questions of credibility or otherwise substitute its own judgment for that of the ALJ.  *Clifford v. Apfel*, 227 F.3d 863, 869 (7th Cir. 2000).  Thus, where conflicting evidence allows reasonable minds to reach different conclusions about a claimant's disability, the responsibility for the decision falls on the Commissioner.  *Edwards v. Sullivan*, 985 F.2d 334, 336 (7th Cir. 1993).

At the same time, the court must conduct a "critical review of the evidence" before affirming the Commissioner's decision.  *Edwards*, 985 F.2d at 336.  If the Commissioner's decision lacks evidentiary support or adequate discussion of the issues, then the court must remand the matter.  *Villano v. Astrue*, 556 F.3d 558, 562 (7th Cir. 2009).  Indeed, even when adequate record evidence exists to support the Commissioner's decision, the decision will not be affirmed if the Commissioner does not build an accurate and logical bridge from the evidence to the conclusion.  *Berger v. Astrue*, 516 F.3d 539, 544 (7th Cir. 2008); *Sarchet v. Chater*, 78 F.3d 305, 307 (7th Cir. 2006).

Plaintiff here makes two, basic arguments.  (Pl.'s Br. (dkt. #9) 9.)  First, he contends that the ALJ's finding that Berz was not disabled before March 25, 2018, is not supported

by substantial evidence.   (*Id.* at 9-20.)   Second, he argues that the ALJ erred in her evaluation of Berz's treating physicians' opinions.   (*Id.* at 20-22.)   The Commissioner counters that the ALJ "accurately and thoroughly discussed" the relevant evidence, and also that her consideration of the medical opinions was proper under the regulations. (Def.'s Opp'n (dkt. #10) 3-15.)   The court will address these arguments in turn.

## I.   Substantial Evidence

Plaintiff spends much of his brief emphasizing that the ALJ's finding of no disability was not supported by substantial evidence because "there were no less than five doctors . . . all solidly in agreement that as of 2015 and through 2017 and beyond, Berz had severe physical limitations that rendered him unable to engage in competitive, fulltime employment." (Pl.'s Br. (dkt. #9) 12-15.)   The relevance of these opinions is, however, not as great as plaintiff suggests.   This is because the ultimate question of a claimant's ability to work is reserved for the Commissioner, 20 C.F.R. § 404.1427(d), and "[a] statement by a medical source that you are 'disabled' or 'unable to work' does not mean that [the Commissioner] will determine that you are disabled," § 404.1427(d)(1).   *See also Loveless v. Colvin*, 810 F.3d 502, 507 (7th Cir. 2016) (ALJ did not have to accept treating physician's "conclusory statement" that the claimant "could not work").

Even though an ALJ need not accept a physician's conclusion that a claimant is disabled, he or she is still required to "review all of the medical findings and other evidence that support a medical source's statement that you are disabled." § 404.1427(d)(1).   As summarized above, many of the physicians' statements regarding Berz's disability were, in part, supported by their findings regarding his fatigue and lack of stamina.   According to

14

plaintiff, the ALJ did not adequately consider these findings.  In particular, plaintiff contends that the ALJ improperly demanded objective evidence to support Berz's complaints of fatigue, which is an inherently subjective condition.  (Pl.'s Br. (dkt. #9) 16.)

Social Security Ruling 96-7p outlines a two-step process for evaluating a claimant's complaints of subjective symptoms, such as pain or fatigue.  First, the ALJ must determine whether there is an underlying impairment that can be shown by acceptable clinical and laboratory techniques to produce the claimant's alleged symptoms.  SSR 96.7p.[3]  Here, at step one, the ALJ concluded that Berz's "medically determinable impairments could reasonably be expected to cause the alleged symptoms." (AR at 26.)  In other words, Berz's varied, medically-determined impairments, including acromegaly and a pituitary disorder, could reasonably be expected to cause his symptoms of fatigue.

At the second step, SSR 96-7p provides that the ALJ must "evaluate the intensity, persistence, and limiting effects of the individual's symptoms to determine the extent to which the symptoms limit the individual's ability to do basic work activities."  When a claimant's statements regarding the severity of his symptoms "are not substantiated by objective medical evidence, the adjudicator must make a finding on the credibility of the

---

[3] At oral argument, plaintiff took issue with ALJ Davis's statement that "disability findings cannot be based solely on [a claimant's] subjective complaints or hearing testimony" (AR at 21), yet her statement is in line with the law as set forth in SSR 96-7p.  In particular, the regulations state that objective medical evidence is required at this first step to establish the existence of an underlying impairment.  However, as discussed above, once an underlying condition is reasonably found to cause an alleged symptom, an ALJ may not at that point "disregard subjective complaints merely because they are not fully supported by objective medical evidence." *Knight v. Chater*, 55 F.3d 309, 314 (7th Cir. 1995).

individual's statements based on a consideration of the entire case record." SSR 96-7p. Case law emphasizes a reviewing court may reverse a credibility determination "only if it is so lacking in explanation or support" that it is found to be "patently wrong." *Simila v. Astrue*, 573 F.3d 503, 517 (7th Cir. 2009) (quoting *Elder v. Astrue*, 529 F.3d 408, 413-14 (7th Cir. 2009)).

This does not mean that a court may *never* disturb a credibility finding. *See, e.g., Briscoe ex rel. Taylor v. Barnhart,* 425 F.3d 345, 354 (7th Cir. 2005) ("While credibility determinations are entitled to special deference because the ALJ is in a better position than the reviewing court to observe a witness . . . they are not immune from review.") (internal citation omitted); *Sarchet v. Chater*, 78 F.3d 305, 307 (7th Cir. 1996) (overturning ALJ decision where ALJ's assessment of claimant's subjective complaints did not build and accurate and logical bridge between the evidence and the result). Of particular relevance here, the Seventh Circuit has previously cautioned that: "[p]ain, fatigue, and other subjective, nonverifiable complaints are in some cases the only symptoms of a serious medical condition. To insist in such a case, . . . that the subjective complaint, even if believed by the trier of fact, is insufficient to warrant an award of benefits would place a whole class of disabled people outside the protection of that law." *Cooper v. Casey*, 97 F.3d 914, 917 (7th Cir. 1996). Accordingly, an "ALJ may not disregard subjective complaints merely because they are not fully supported by objective medical evidence." *Knight v. Chater*, 55 F.3d 309, 314 (7th Cir. 1995).

The Seventh Circuit's decision in *Carradine v. Barnhart*, 360 F.3d 751 (7th Cir. 2004), is particularly instructive on this subject. In *Carradine*, the claimant had a severe

16

back injury, which she claimed was the cause her ongoing pain; yet the ALJ disbelieved her testimony about the severity and limiting effects of her pain, and ultimately rejected her application for disability. *Id.* at 754. In reversing, the Seventh Circuit concluded that the ALJ erred, taking issue with a number of the ALJ's findings. *Id.* at 754-56. First, the court critiqued the ALJ's remarks that the claimant's physicians had not been able to find objective evidence to support the claimant's account of pain or take her complaints at face value, writing that severe pain is not inconsistent with the absence of findings from diagnostic testing or physical examinations. *Id.* at 755. Second, the court indicated that the ALJ did not properly consider the fact that the claimant underwent a series of pain-treatment procedures and had convinced a variety of doctors of her symptoms. *Id.* Third, the court critiqued the ALJ's findings that the claimant's testimony was inconsistent with the activities she acknowledged engaging in. *Id.*

The ALJ's findings in the present case suffer from similar defects. First, the ALJ multiple times indicates that Berz's complaints of fatigue are undermined because there is no objective clinical proof of his symptoms. (*See, e.g.*, AR at 24 ("the undersigned is not persuaded by the claimant's continued complaints of extreme fatigue and associated limitations, which are inconsistent with the underlying outpatient treatment notes reflecting good, stable findings on physical examination"); AR at 24 (discounting complaints of fatigue where "physical examination was generally within normal limits with few if any clinical abnormalities")). She also faults Berz's medical sources for being too dependent on Berz's subjective complaints. (*See, e.g.*, AR at 27, 28.) Yet, as Dr. Fowler explained, fatigue "cannot be well measured for [Berz] or any other such patient. In other

17

[words], we remain highly dependent on the claimant's own report."   (AR at 566.) Therefore, as in *Carradine*, "the doctors had no choice but to take [the claimant's] complaints . . . 'at face value.'"  360 F.3d at 755.

Second, the ALJ fails to acknowledge the extent to which Berz sought treatment for his fatigue and poor stamina.  Fatigue was Berz's primary complaint in numerous treatment records since his alleged onset date in August of 2015.  (*See, e.g.*, AR at 449, 454, 456, 464, 491, 486, 482, 484, 571, 617.)  While the ALJ found that after October of 2015, Berz sought only "periodic treatment to monitor his conditions," (AR at 24), this finding appears unreasonable in light of the fact that Berz had appointments on December 8, 2015 (AR at 491), December 31, 2015 (AR at 486), January 19, 2016 (484), February 22, 2016 (AR at 482), and beyond, each time to address his concerns of fatigue specifically.  Further, Berz sought, and received, multiple adjustments to his medications in an attempt to treat his condition, including a sertraline prescription, an increase in testosterone dosage, a decrease in metoprolol, and a new BPAP mask.  (*See* AR at 454, 456-57, 487.)

In *Carradine*, the Seventh Circuit reasoned:

> What is significant is the improbability that Carradine would have undergone the pain-treatment procedures that she did . . . merely in order to strengthen the credibility of her complaints of pain and so increase her chances of obtaining disability benefits, . . . likewise the improbability that she is a good enough actress to fool a host of doctors and emergency-room personnel into thinking she suffers extreme pain; and the (perhaps lesser) improbability that this host of medical workers would prescribe drugs and other treatment for her if they thought she were faking her symptoms. Such an inference would amount to an accusation that the medical workers who treated Carradine were behaving unprofessionally.

360 F.3d at 755; *see also Clifford v. Apfel*, 227 F.3d 863, 872 (7th Cir. 2000), *as amended* (Dec. 13, 2000) (overturning ALJ credibility determination in part because ALJ did not adequately address the fact that "the record is replete with instances where [the claimant] sought medical treatment for pain symptoms related to her physical impairments"). The full strength of these critiques apply equally to the ALJ's treatment of plaintiff's fatigue complaints in this case.

Third, the ALJ discounted Berz's complaints of fatigue because "the nature and scope of [his] activities appears disproportionate to his allegations of disabling symptoms" (AR at 24), yet *none* of the activities she describes actually contradict Berz's alleged fatigue limitations. Specifically, the ALJ found inconsistent with his subjective complaints the fact that Berz's ability in October of 2015 to walk a half a mile and stand for 60 minutes, his ability in 2016 and 2017 to walk a mile a day without dysapnea, and his ability in 2017 to walk his dogs regularly. (AR at 23-24.) Yet Berz's complained-of limitations regarding his fatigue were that he could only work for limited amounts of time before needing to take frequent breaks and that he often had to take naps, and none of the activities identified by the ALJ contradict his reported limitations. Likewise, the ALJ found that Berz's use of a snow blower "[r]eflects greater physical abilities than the claimant alleges," even though Berz reported being exhausted after using the machine. (AR at 24.) Indeed, just as in *Carradine*, the ALJ "failed to consider the difference between a person's being able to engage in sporadic physical activities and her being able to work eight hours a day five consecutive days of the week." 350 F.3d at 755; *see also Mendez v. Barnhart,* 439 F.3d 360, 362 (7th Cir. 2006) ("We have cautioned the Social Security Administration against placing undue

weight on a claimant's household activities in assessing the claimant's ability to hold a job outside the home."); *Zurawski v. Halter,* 245 F.3d 881, 887 (7th Cir. 2001) (reversing where the ALJ relied on "fairly restricted" activities and failed to explain how such activities were inconsistent with the claimant's complaints of pain).

The fourth and final reason that ALJ Davis gave for discounting Berz's reports of fatigue was their purported inconsistency with certain medical records.  In particular, the ALJ notes that Berz did not mention fatigue issues in an October 1, 2015, post-operative appointment with his orthopedic surgeon, nor during his physical therapy sessions in the fall of 2015.  According to the ALJ, these omissions "raise[] doubt as to the reliability of [Berz's] fatigue complaints."  (AR at 23.)  Yet this is not a logical conclusion to draw from the evidence.  To begin, on September 28, 2015, and October 2, 2015, Berz had no fewer than *three* appointments with various other doctors to discuss his fatigue issues specifically.  (*See* AR at 449, 456, 464.)  Moreover, that Berz did not also complain about ongoing fatigue to his orthopedic surgeon on October 1, 2015, a few months after undergoing a total knee arthroplasty does not call into question the reliability of his complaints.  If anything, the failure to mention it would seem the *more* normal of the two possibilities in that setting.  Finally, contrary to the ALJ's assertion, Berz *did* complain of fatigue in at least one of his physical therapy sessions.  (*See* AR at 374.)

It is undeniable that social security claimants who allege disability due to subjective complaints such as pain or fatigue "make the job of a social security administrative law judge a difficult one."  *Carradine*, 360 F.3d at 753.  Nor was this a case in which an ALJ overlooked significant records or cherry-picked only evidence favorable to her conclusion;

on the contrary, ALJ Davis here engaged in a lengthy discussion regarding Berz's allegations of fatigue.  Nevertheless, a close examination of the medical record and the ALJ's reasoning indicate flaws that the Seventh Circuit has previously held to be reversable error.  In particular, the reasons offered by the ALJ do not build an accurate and logical bridge from the evidence to her conclusion that Berz's persistent complaints of fatigue imposed *no* limitations on his ability to work full-time.  Accordingly, this case will be remanded to the Commissioner for further consideration.[4]

## II. Opinion Evidence

Plaintiff also complains that the ALJ did not properly consider the opinion evidence in the medical record.  An ALJ is required to evaluate every medical opinion in the record. 20 C.F.R. § 404.1527(c).  The rules that govern plaintiff's claim provide that a treating source's medical opinion is entitled to "controlling weight" if, and only if, it is (1) "well supported by medically acceptable clinical and laboratory diagnostic techniques" and (2) "not inconsistent with the other substantial evidence in the case." § 404.1527(c).[5]  If a

---

[4] Frankly, this case is one in which the court contemplated entering a finding of disability rather than remand, but the bar to do so is so high, thus remand is the more appropriate disposition.  *See Allord v. Astrue*, 631 F.3d 411, 415 (7th Cir. 2011) ("An award of benefits is appropriate, however, only if all factual issues involved in the entitlement determination have been resolved and the resulting record supports only one conclusion -- that the applicant qualifies for disability benefits.").  Moreover, while the VE did testify that an added limitation of "consistently off task for at least 15% in an eight-hour workday" would result in a finding of disability, no doctor specifically voiced that limitation (although doctors did opine that he would need frequent breaks), making remand for a new formulization of Berz's RFC more appropriate here.

[5] Three years ago, the Social Security Administration modified this rule to eliminate the "controlling weight" instruction.  *See* 82 Fed. Reg. 5867-68 ("We will not defer or give any specific evidentiary weight, including controlling weight, to any medical opinion(s) . . .").  However, the new regulations apply only to disability applications filed on or after March 27, 2017.  Plaintiff's application in this

treating source's opinion is not given controlling weight, the ALJ must consider the following factors in deciding the weight to give to the opinion:  the length, frequency, nature and extent of the treatment relationship; the source's area of specialty; the degree to which the opinion is supported by relevant evidence; and the degree to which the opinion consistent with the record as a whole. § 404.1527(c).  While a court must uphold "all but the most patently erroneous reasons for discounting a treating physician's assessment," *Stepp v. Colvin*, 795 F.3d 711, 718 (7th Cir. 2015) (quoting *Luster v. Astrue*, 358 Fed. Appx. 738, 740 (7th Cir. 2010)), an ALJ must provide "good reasons" for discounting or rejecting a treating source's opinion.  20 C.F.R. § 404.1527(d)(2); *Mandella v. Astrue*, 820 F. Supp. 2d 911, 922 (E.D. Wis. 2011) (citing § 404.1527(d)(2)).

According to plaintiff, the ALJ "outright disregarded the law for the evaluation of medical evidence" by failing to give adequate deference to Berz's treating physicians' opinions.  (Pl.'s Br. (dkt. #9) 20.)  While plaintiff does not argue that the physicians were entitled to controlling weight, he does generally contend that they should have been given *more* weight.  (*Id.* at 20-22; Pl.'s Reply (dkt. #11) 3-7.)  The Commissioner counters that the ALJ properly discounted the treating physician's opinions using the regulatory factors. (Def.'s Opp'n (dkt. #10) 10-15.)

Certain of plaintiff's objections are misplaced.  First, plaintiff urges that "a treating source is entitled, at minimum, to deference."  (Pl.'s Reply (dkt. #11) 6.)  But this is not the law.  As long as the ALJ reasonably considers the proper regulatory factors and explains

---

case was filed on August 17, 2015. Accordingly, the ALJ was required to apply this treating physician rule when deciding plaintiff's application.

and supports her reasoning, an ALJ may significantly discount and even entirely reject a treating source's opinion. *See Jelinek v. Astrue*, 662 F.3d 805, 811 (7th Cir. 2011) ("An ALJ who chooses to reject a treating physician's opinion must provide a sound explanation for the rejection.") (citing 20 C.F.R. § 404.1527(d)(2); *Campbell v. Astrue*, 627 F.3d 299, 306 (7th Cir. 2010)).  Second, plaintiff contends the ALJ did not apply the proper regulatory factors to a number of Berz's treating physicians' statements that he was permanently disabled and unable to work.  While not applying the regulatory factors to assess the weight of certain of these statements, the ALJ was not legally required to do so because they were not "medical opinions" under the regulations.  Conclusory statements about a claimant's ability to work -- as opposed to opinions about the nature and severity of the claimant's impairments -- are not medical opinions and, therefore, the ALJ need not accept or evaluate and discount each such statement.  *See Loveless v. Colvin*, 810 F.3d 502, 507 (citing 20 C.F.R. § 404.1527(a)(2)).

Nevertheless, the court agrees that the ALJ's assessment of the consistency of each of the opinions was flawed.  In particular, the ALJ found that any fatigue-related limitations voiced in the physicians' opinions were not consistent with the medical record, yet failed to acknowledge the consistency between the opinions of Drs. Cunningham, Stevens, and Fowler, who all opined that Berz would require breaks at least once every hour.  (*See* AR at 566 (Dr. Fowler opined that Berz would need "extraordinary freedom to nap or otherwise take a break lasting at least 15 minutes at a time, at least once every 30 minutes during his work shift"); AR at 583 (Dr. Cunningham opined that Berz could only sit, stand, walk, or drive for one hour at a time within a standard work day, and that these abilities were

23

"severely" limited by Berz's stamina); AR at 475-76 (Dr. Stevens opined that Berz would require hourly unscheduled breaks for 10 to 15 minutes and would be absent from work more than 2 days each months).)  The ALJ will obviously need to address this deficiency on remand.  *See also Moss v. Astrue*, 555 F.3d 556, 561 (7th Cir. 2009) (ALJ must consider the consistency of a medical opinion with the medical record); *Dallosto v. Berryhill*, No. 16 CV 50294, 2017 WL 4512558, at *2 (N.D. Ill. Oct. 10, 2017) ("An important point -- perhaps the central one justifying a remand -- is that, aside from a few relatively minor exceptions, all three medical opinions were consistent with each other. This is significant. The ALJ glossed over this fact and instead engaged in a piecemeal divide-and-conquer strategy, examining each opinion seriatim. . . . Given this interlocking consistency, the ALJ was required to come forward with compelling reasons to reject *all* three opinions *in toto.*"). Moreover, the ALJ may wish to revisit her analysis of the opinion evidence in light of her updated analysis of Berz's subjective complaints, as instructed above.

## ORDER

IT IS ORDERED that the decision of defendant Andrew M. Saul, Commissioner of Social Security, denying in part plaintiff Randal Berz's application for disability and disability insurance benefits is REVERSED AND REMANDED for further proceedings consistent with the opinion set forth above.

Entered this 7th day of May, 2020.

BY THE COURT:
/s/
WILLIAM M. CONLEY
District Judge